Our next case today is appeal number 24-2993 John Doe v. NCAA. All right, Mr. Selvin, whenever you're ready. Good morning, Your Honors. Excuse me, Jonathan Selvin, Leif Grazer, Hyman, and Bernstein on behalf of Plaintiffs Appellants, the John Doe student athletes. I reserved four minutes for rebuttal, if that's permissible. Your Honors, we are here today on two issues decided by the District Court. And the question here is, did the District Court err in finding as a matter of law on a motion to dismiss that the NCAA owed and owes no duty to protect its student athletes from coach sexual abuse? Is your position on that that the District Court can never decide as a matter of law at the motion to dismiss stage whether a defendant has assumed a duty? It is not our position that they can never decide it. If you look at the Indiana case law going back many decades now, it's almost always done on summary judgment. Perhaps the best example is the Lanny case involving the NCAA itself, where the court held that it was erroneous to decide that on a motion to dismiss. It should have been decided on summary judgment. It went back up on summary judgment, and we get the second Lanny decision on that point. So it's not that you can never do it. It's that where plaintiffs plausibly allege all of the elements and all of the facts that we have here to support both a voluntary assumption of duty and a common law duty. But I think what the District Court says it has to be more than at the speculative level, right? Right. Agreed. And here what I see in the complaint are just very broad statements that the NCAA is out for the well-being of its student-athletes. Let me ask you this question. Sure. Does the NCAA have the same duty to regulate sexual misconduct between student-athletes? I think that's a different question, Your Honor. Why? It's a good question. Because it doesn't have the same level of control as it has over the coaches, over the student-athletes. It controls all sorts of things about student-athletes and their interactions with coaches, and we allege that from both sides. But that has to do with competition. No, not just with competition. What they can eat, what supplements they can take, how many innings they can pitch in a baseball game. That all has to do with regulating competition. It has nothing to do with sexual activity. Well, I would actually point, Your Honor, to the student-athlete health and well-being section of the manual. And if you take a look, the 2023-2024 manual is in the docket at 257-2. The prior manuals are available online, and the parties have agreed that the court can look at the prior versions of the manuals, as I understand it. And there's a section called student-athlete health and well-being. And it says that the NCAA, in the earlier versions it said the Board of Governors, also the NCAA, promulgates guidance, rules, and policies for, among other things, student-athlete physical and mental health, safety, and performance. That's not competition. So does the NCAA assume a duty to regulate sexual activity between athletes at different schools? I don't believe it does. Why not? I don't believe it does, but that's not our question here. Our question here is, does it owe a duty to protect student-athletes from abuse by coaches and athletics personnel? And I think the difference is, there's an important difference here. And this gets into the common law duty, as opposed to the voluntary assumption of duty. Two different ways we get there. But this has to do with foreseeability. They know that coach sexual abuse of student-athletes is rampant. They know that student-athletes are at a particular heightened, not the general public, but at a heightened risk of sexual abuse from coaches and athletics personnel, not from other student-athletes. So they know those two things. Why does that distinguish my hypothetical? We have Title IX cases all the time where the school didn't protect student A from student B. Right. All the time. I think in a lot of those cases, if you're looking under the negligence part of the cases, you're right about Title IX. If you're looking under the negligence part of those cases, courts often find there is no duty to protect students from sexual assault by other students. So there's case law from Indiana that says that. There's no duty to protect students from other students' sexual assault. In the negligence context, that's Title IX. We don't have a Title IX case. This is against the NCAA. So our point is that in the negligence context, they have a level of control over the coaches. They micromanage the coaches, everything about what they can do vis-a-vis the students, what the students can do vis-a-vis them, the interactions, what a student can eat, who they can eat with, when they can eat. Are there any rules that you can point to where the NCAA has promulgated anything to control behavior between coaches and athletic staff with regards to sexual misconduct? Anything that you can point to, other than the broad statements regarding health and well-being of the student athlete? I cannot point to anything. In fact, I think we posed a hypothetical in our brief about if discovery shows there's no policies about this and there's no policies about that and there's no policies about the other. By the way, we think all of that is true. They don't have those policies. But you don't provide any basis for believing that any of these things exist beyond pure speculation. It's a hotline example. Isn't that your claim here, though, that there should be and there's not, and that's why you're suing? That's the claim. As I was flying here on my United flight yesterday, I thought, what if United suddenly decided that they simply were no longer going to have policies or procedures that governed pre-flight safety checks on their airplanes? Suddenly, United Airlines says, we're just not going to govern that. We think the ground crews can do it. We think the airports can do it. We're not going to have policies or procedures to protect our passengers with respect to pre-flight safety checks. I think we would all agree that absence of that duty is a breach of that duty. But wait. OK, but wait a minute. But you're suggesting that the NCAA has this duty over its members. You've changed the analysis, and you're saying above American Airlines, the FAA is going to say, we're not going to have any policies or procedures. Not United Airlines, because you're equating United Airlines to the NCAA. United Airlines is the University of Illinois, not the NCAA. OK, so we can make it the FAA. Illinois has the duty, right? And I don't think you would dispute that. Well, they both have the duty here. And it says expressly in the Constitution of the NCAA. And they make the argument, no, no, no, no. It's just the member institutions who have this authority. They haven't delegated it to us. But doesn't your interpreter? Wait, wait, wait, wait. The association has the duty. Wait, wait, wait. Time. Stop. The point of oral argument is for the judges to ask their questions. OK? You've already said, I've read your brief multiple times, OK? You've already said everything you need to say. Now, I want to ask my question.  Why is, why based on your hypothetical does your case not fail? You just gave me a hypothetical that said United Airlines. You're equating United Airlines to the University of Illinois or the University of San Francisco. Why under your own hypothetical does your case not fail? Unless we find that the NCAA is equivalent to United Airlines. I think you can find that the NCAA is equivalent to either United Airlines, which is how I thought of it. You could say the United Airlines is the FAA. If the FAA suddenly said, we're no longer going to mandate pre-flight safety checks. Not if United does it. But, but, but, no, because they both have the duty. That's the point. In both circumstances it takes. Where does it, where does the NCAA say we're taking on that duty? Or where do you even allege that the NCAA says it? Beyond these broad statements that the NCAA protects the well-being of students. So, so it starts with their, their core mission going back to 1906. A broad statement, right? We're founded to protect physically and mentally student athletes on the field and off. Then you get to their constitution where it says under student athlete safety, health, and well-being. They're going to promulgate guidance, rules, and policies. That's not, that's not general. It's hard to say there what they wouldn't have a duty to do. Basically, and I think your argument is, no, let us get past the motion to dismiss stage. And then we'll go on this fishing expedition to see what we can find. And that's the whole point of a motion to dismiss. And I think that's what Judge Barker said. Right. I, I don't think that the excruciatingly detailed regulations that are set forth in the bylaws. Which if you pull that document up. Which one specifically? So, so you can go page by page by page. It governs everything else. And I agree with you. Except this. Everything else except this. And that's, as your Honor said, that's the point of this claim. Doesn't that mean they didn't assume a duty? Period. That's it. That's a circular argument, your Honor. That's, we don't owe a duty because we didn't take our, that duty upon ourselves. And I don't think that's the law or it's logical. I think, sorry. I have a different question, Mr. Selvin. Sure. You, you do take the position, you're looking at cases like Yost and Smith. And you say they're inapplicable. Because the NCAA is nothing like a national fraternity.  And I understand that. What are we to do with Lonnie 2? Right. You know, where it involved the NCAA. And we already have the Indiana courts saying, you know, the NCAA does not owe a duty to protect students even from injury. Right. It's the context that matters. And it's the specific factual allegations in Lonnie and how they're distinguished from here. So in Lonnie, the question, yes, it involved a student athlete. Not as a student athlete, as a spectator at a sporting, at a NCAA sanctioned sporting event. So she was actually injured while watching another match. And the only allegation there, and I think we walked through this pretty clearly in our brief. The allegations there are exactly the sort that Judge Kirsch is talking about. Very generalized. They have a duty to protect. And okay, so what? In this context of a sanctioned NCAA match, that's more like the national fraternities. We think hazing is bad. We've alleged very detailed specific regulation. And let me just give you an example if this is helpful. Last month, my alma mater, University of Michigan, and its former coach Jim Harbaugh were punished by the NCAA for violation of NCAA rules. The violations, they helped a student athlete get a blue checkmark on his Instagram account. They made a donation in his name to a charitable cause. And they came down hard on the coach for that. If Jim Harbaugh had only sexually abused that student, their argument would be, and the district court's holding would mean, that they have no duty to protect those students from that. I can't imagine that that's the law. And so I think it's really important that we focus here both for purposes of the voluntary assumption and then when you get to the common law duty. I think we've alleged a special relationship here between the NCAA and the coaches and a special relationship between the NCAA and the student athletes. It comes from both sides. Everything about their interactions is governed except this, and that's the basis of our claim. I see that I'm into my rebuttal time. I want to say a couple quick words about standing, if I could. The standing issue relates to the injunctive relief claim. I think that we've established what's required under the Murthy case. We've got more here than simply past abuse, and we've got more here than simply a possibility of future abuse. We've got somebody who's experienced both of those things, and I would just make the point on the standing point that literally nothing would prevent the new institution, the NCAA institution at which John Doe is as a graduate student now, and he still has a year of eligibility, nothing would prevent that institution from hiring the same coaches who abused him at USF. Why is that? Because the NCAA has done nothing to protect student athletes from sexual abuse. If there are no more questions, I'll keep my rebuttal time. Okay, thank you, Mr. Chairman. Thank you. Okay, we'll now hear from Ms. Sanders. Good morning. I'm Ginger Anders representing the NCAA. So I'd like to focus this morning on three points that I think make it very clear that the district court correctly held that the plaintiffs have failed to allege that the NCAA has a duty here, and I think they've already been discussed quite a bit in Your Honor's questioning this morning. So the first point is that Indiana law, so in other words, Yost, Smith, and Laney, which are binding on this court in this diversity case, those cases are clear that to have a duty to protect students from coach misconduct, the NCAA would have to exercise day-to-day control and oversight over coach and student activities, which means, according to Yost and Smith, that on the ground preventative oversight and supervision of day-to-day behavior. That's what those cases say. And I think those cases are equally clear that a national organization's maintaining even detailed, enforceable rules on the safety issues implicated by the case does not give rise to the necessary day-to-day control and therefore cannot create a duty to ensure student safety. And on that point, I would just like to… I want you to get back to your outline, but I want to interject here and ask you to respond to the example Mr. Selvin just gave us about the NCAA coming down hard on the Michigan coach for helping a student get a blue checkmark, and there was one other piece of conduct that the NCAA sanctioned the coach and the school for. So in the course of answering this spot number one on your outline, and then you can return. Can you address an example like that? Sure. So let me answer that directly, but first make sort of a framing point. And I think the framing point is that even if the existence of a duty under Indiana law doesn't turn on whether the NCAA has rules specifically on sexual misconduct because I think Yost and Smith and Lanny are very clear that even if there are national organization enforceable rules on the subject, the safety subject at issue, that does not give rise to a duty because it's not day-to-day control. So I think in that sense, I think the example is just completely inapposite here. Then I would say that to the extent that my friend on the other side is suggesting that the NCAA is sort of regulating some subjects but not others in order to – because of liability concerns, I think that claim just doesn't hold water. The first reason for that is what I just said, the existence of a duty doesn't turn on it. But I think in addition, the member institutions here have made a considered judgment about what the NCAA is best placed to regulate. That tends to be competition and eligibility, subjects on which otherwise there might be a collective action problem among multiple schools if they didn't regulate, but they have expressly retained authority over things like safety and employment, the sort of on-campus well-being issues. They have retained those issues to themselves. That reflects a judgment that I think dovetails perfectly with Indiana law here, which is that it is the organization that is on the ground that has that day-to-day control that is best placed to ensure safety and that at the very same time has significant liability if it doesn't. Council, what about concussions? You know, the NCAA does have a committee on concussions. This is a problem that's been out there, well-publicized. Why couldn't they just establish a commission here, and why haven't they? Because it seems to me the NCAA is putting its head in the sand on a well-documented problem. You know, given the fines that they imposed on Sandusky, how do you reconcile concerns with physical health versus emotional health? The NCAA is wanting to have a duty sometimes but not other times. So, again, I would say that what it regulates is not driven by the existence of duty because Indiana law is clear here that even if they regulated, there would not be a duty because those rules would not equate to day-to-day control. And I think the answer would be the same on the concussion side. There are some rules there, but they do mostly point back to the member institutions. And, in other words, you have to have a policy, but we're not going to tell you exactly what the policy has to be. And I think that reflects something important here too, which is that the member institutions want to maintain their own flexibility over things like sexual misconduct coach interactions because those are unique to the campuses, the individual campuses. There's Title IX liability to consider, that universities can be liable both for government investigations and for private actions under Title IX. There is state law to consider. And there's just appropriateness to the institutions. So flexibility here is extremely important because it's easy to imagine national rules that would not be appropriate to particular institutions but might be appropriate to others. We're talking about 1,000 universities across the country, from the small liberal arts school to the massive state flagship school. But with concussions, it's reporting, right? I'm looking at it. There's an annual report, right? So it's collecting information. For some purpose, because of a duty to the health of the athletes, correct? There's a reason that they're collecting this. Why couldn't the same—why is it negligence not to do the same for sexual misconduct? So I'd like to make a framing point about Indiana law here because I think this is very analogous to the national fraternities and the local fraternities in Yost and Smith and the NCAA itself in Lanny. And that point is that Indiana law, I think, takes—when it considers the question of duty, it respects the structure of these organizations and takes them as it finds them. And so in Yost, for instance, the national organization did not have day-to-day control. In Smith, there were detailed rules promulgated by the national fraternity but not day-to-day control. In Lanny, there were safety rules but not day-to-day control. And the court didn't say we expect those national organizations to do more, to take day-to-day control. Instead, we respect the way these organizations have structured themselves, and I think that reflects a really important policy— I mean, if the law were otherwise, doesn't it mean that the NCAA would have to regulate every conceivable form of conduct? I mean, which is what I—they have to regulate athlete-on-athlete sexual misconduct. They have to regulate athlete-on-athlete from other school sexual misconduct. Perhaps they'd have to regulate athlete-versus-athlete sexual misconduct on vacation, on spring break in Cancun. I think that's exactly right, and I think that's exactly what the court, the Indiana Supreme Court, said in Yoast. So at page 518, the court said national organizations should be encouraged, not disincentivized, to undertake programs to promote safe and positive behavior and to discourage hazing and other undesirable conduct. And I think the point— In other words, the point is the Indiana Supreme Court wants to encourage the NCAA to regulate on things like concussions, but they don't want to mandate the NCAA to regulate on every conceivable subject. That's exactly right. And so I think because the NCAA is an organization of limited authority that is delegated by the member institutions, the member institutions have delegated authority and directed regulation where they think it is the NCAA as the national organization that is best placed to regulate and where there's a need to regulate. And so Indiana law, I think, respects that judgment and says we want you to be able to regulate in some places where that is consistent with your confined role as a national organization, but we don't want to force you to regulate in other areas where a uniform national rule may not be the best thing to have. And again, I guess I would emphasize here that my friend on the other side suggests that there will be no liable party if the NCAA doesn't have a duty here. Nothing could be further from the truth. The member institutions themselves have day-to-day control, I think, under Indiana law. They maintain the premises. They hire, vet, supervise the coaches. They can be liable under Title IX and under state law, and indeed the plaintiffs here have brought that suit directly against the University of San Francisco. So there is a remedy here, and I think what Indiana law is saying is that we want to place the duty in the institution that is best placed to actually on the ground step in, prevent, and address this conduct when it occurs. And that's the duty. On the common law duty question, is it necessary for you to defend the district court's foreseeability, reasonable foreseeability ruling to win? Because there are three duties there that are applicable, and you only need two, let's say. You don't need all three. And I'm questioning reasonable foreseeability because I understand your argument. It was not reasonably foreseeable for the NCAA to know that these USF coaches would harass these students. But as I understand Indiana law, the reasonable foreseeability question is broader than that. It's not like the reasonable foreseeability question when we're looking at proximate cause in other tort cases, and it's much broader. It's about whether the defendant could reasonably foresee the general type of negligence could result in some general type of harm. So here we have the NCAA itself is recommending, as you've pointed out, that member institutions undertake policies to deal with sexual misconduct. Isn't that basically an admission that regulations and enforcement of the kind that would prevent harassment from occurring in the first place is a good thing? We already have the NCAA saying that over a decade ago. So I agree with Your Honor that the foreseeable inquiry is broader. So if I could just situate that in the overall common law duty analysis and explain why I don't think you need to reach it ultimately. So I think the common law duty analysis does have three prongs to it. The single most important one is the special relationship. Is there a special relationship between the NCAA and coaches or students? That's what the court said in JAW. That's what the Indiana Supreme Court said in our brief. It's that absent a special relationship, we will not impose a duty here. So I think probably the most faithful thing that this court could do to be most faithful to Yost and to Lanney would actually be to find that there's no common law duty without addressing foreseeability because in both of those cases, the court looked only to the special relationship. There was none, and looked to public policy, concluded that somebody else was better placed to protect the safety in question and said there's no common law duty without addressing foreseeability. And I know that this court acts with caution in diversity cases, and so that would be, I think, that route would be the sort of most direct way to be totally faithful to what the court said in Yost and Lanney. Now on foreseeability, I do agree that it's a categorical analysis. The court is to, under Goodwin, evaluate the category of negligent conduct at issue. And so reading the Indiana case laws, I think the best reading of them is that you take into account the nature of the defendant's role, and if there is another party that has a more direct responsibility here, which unquestionably there is in this case since the member institutions expressly have the authority under the governing documents, they also have the day-to-day control, that because there is somebody else with that much more direct responsibility, that it isn't foreseeable to the NCAA that its conduct either way would cause injury. So that's our position on foreseeability. I do think that's a categorical analysis, but I do think you don't need to reach it because I think it's very clear here that the NCAA doesn't have a special relationship with coaches or students. And if I just address my friend on the other side, his main point is that students are vulnerable to coaches. Note that the special relationship in question is between the NCAA and the students, not between the coaches and the students. So the NCAA and the students need to have a relationship that is, as the court put it in JAW, a level of interaction or dependency that surpasses what is common or usual. And so the types of relationships that have counted are parent-child, patient-nursing home, those sorts of things. I think it's very, very clear that the NCAA and students don't have anything close to that kind of relationship. It is, as the court said in Yoast, remote and tenuous. You have the national organization and you have students. I just don't think there's any argument here that the students are uniquely vulnerable to the NCAA, which is the relevant question here. And then with respect to public policy, I think it's equally clear that the courts, the Indiana courts look to who is in the best position to prevent injury and how society should allocate those costs. I think for all the reasons we've been talking about, it's very clear that it is the member institutions that are best placed to address the injury. That's what they themselves have decided. And it's just true when you think about they're the ones who hire and supervise the coaches, maintain the premises in which these interactions occur, have mentoring and retention programs to protect students, and of course can be directly liable and seriously liable, as your honors reference in the Sandusky matter shows. The liability here can be extensive, and for that reason, these member institutions have tremendous incentives. They have financial incentives, legal incentives, and reputational incentives to regulate this conduct, to address it when it occurs, and to try to prevent it as best they can. And so I think it's very, very clear here how public policy cuts. And then finally, I would say on that point, to go back to Yoast, the court said we only impose a duty in unusual circumstances. We need to be very, very sure that it makes sense to do it. And in the case, as we were discussing before, in a case where you have a national organization that is regulating on some subjects within its bailiwick, it is harmful to impose a duty based on those acts of regulation because we want to encourage these national organizations to foster a culture of safety within the confines of their responsibilities. But I don't take you to be protesting the basic notion that one of the things that encourages member institutions to get their coaches in line on different accesses, on different subjects matters, is the prospect that the NCAA could come crack down on them. Well, I think the thing that encourages them in the first instance is the federal and state law liability that they potentially face when they don't do this. And I think what the Indiana Supreme Court looks to is, is there that direct day-to-day control? And I just want to focus on that for a second. In other words, day-to-day control is the limiting principle to appellant's argument. That's exactly right. Otherwise, there is no limiting principle. Right. And the way that the court put it in Smith was preventative direct supervision and control of behaviors in Yost to directly oversee daily activities. So I think it's quite clear that that is talking about on-the-ground supervision, the ability to intervene in real time. The court says in Yost that the local fraternity that does have that sort of like on-the-ground presence might be well- What about the FAR? There's been some discovery in this case. Obviously, this was a dismissal on the pleadings, and so we're not supposed to be looking at what came out. But it seems to me that there is someone who wears two hats that's at the institution. And I know there's a question as to what that FAR reports to the NCAA, which might come out in discovery if there's been any on this issue. May I answer? Yes. So the FAR, there are some allegations in the complaint about this. The FAR is an employee of the university, of the Bember Institution, not the NCAA. So it doesn't answer to the NCAA. And that person has some limited compliance duties that are based on the existing bylaws. But I think Indiana law is very, very clear that that does not give rise to day-to-day control. In Smith, it was the case that the national fraternity appointed a chapter advisor. That person actually was answerable to the national fraternity, so a more clear line of accountability. Those were summary judgment cases, right, Yost? They were. But what the court said there was that this is, I think, essentially a mixed question of law and fact. If the facts are not sufficiently alleged, then you can decide duty as a matter of law. And I think the issue here is that the complaint is completely devoid of any allegations of day-to-day control, which, again, is what is necessary under Indiana law. And that's because the plaintiff's sole theory of duty here, and you can see this at paragraph 557 of the complaint, the sole theory is that because the NCAA has some rules and bylaws on other subjects, it therefore has a duty to regulate on this as well. That is their sole theory of duty. And that's why you can look through every paragraph of the complaint, and you will not see any of the allegations that would make day-to-day control plausible. You don't see any allegations, for instance, of on-campus presence in the NCAA. You don't see any allegations, and this would be implausible, I think, that they are somehow exercising this on-the-ground preventative supervision on 1,000 campuses, involving 20,000 athletic teams across the country. Okay, thank you. Thank you, Ms. Anders, Mr. Selman, for rebuttal. Mr. Selman, before you start, I'd like you to answer a question going back to your United hypothetical. And that is, what is the limit if day-to-day control is not the limiting principle under Indiana law for duty? What is? I mean, United clearly has day-to-day control. And then as to day-to-day control, point to the allegations in your complaint that allege day-to-day control of the coaches and student athletes in terms of sexual misconduct. Very good, John. I actually would probably agree with you that day-to-day control is the limiting factor, and that's what makes this a different case than all the other types of cases we're talking about. The NCAA does, in fact, have day-to-day control. I hear about 1,000 institutions, 20,000 students. They tell those 1,000 institutions and 20,000 students what an athlete can eat, when they can eat it, who they can eat it with, when they can train, whether they can drink a particular kind of drink, and on and on and on and on. So in terms of the paragraphs of our complaint that allege that, that's all the paragraphs that talk about those regulations, and in particular the manual itself. And I went back and read through the manual yesterday, and I would say, Your Honor, it is hard to imagine a more comprehensive list of requirements for day-to-day interactions than what the NCAA sets out there. But then they would have to regulate on everything. Well, but they do regulate on everything. And I want to get back to your question earlier about the student-athlete issue, because I do think that we've alleged a different claim here than student-on-student. But just so you know, they do require student athletes who want to transfer in the transfer portal, they are required to report to their new institution whether they've been accused of sexual assault against another student. Guess who's not? A coach. That's why coaches move institution to institution to institution. Sounds like another kind of case that we're all familiar with. It's a purposeful blind eye by the NCAA. They are the only ones in a position, and this gets to public policy, they're the only ones in a position to prevent that from happening. No member institution can prevent a coach from moving on to another institution. It happened, the Aldrich case, which is in the pleadings or in the briefing, was our case. That happened to those women. They were abused after a coach moved institution to institution. And so they are the only ones who can do that. Let's see. 38 seconds, okay. I want to talk again about this notion that only the member institutions can deal with this and that that's sufficient. That's not what the NCAA says. That's not what its own manual says. It says the association and the member institutions, and we know under Indiana law, and we cited the case on it, more than one person can owe a duty, and this gets back, Your Honor, to the United hypothetical. It may be sufficient in some senses that United, if you want to make the NCAA the FAA, it may be sufficient that United will undertake to do some things, but it's okay to have a duty on more than one entity. And so if the FAA is the NCAA and they stopped regulating flight safety, I don't think any of us would feel like it was fulfilling its duty to protect passengers either. I'm out of time if there are no more questions. Okay, thank you, Mr. Selma, and thank you, Ms. Anders, for your excellent advocacy. We'll take the case under advisement.